## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ROY MUNOZ,

      Plaintiff,

    vs.                                 Civ. No. 17-881 WJ/SCY

FCA US LLC,

      Defendant.

### MEMORANDUM OPINION AND ORDER
### DENYING PLAINTIFF'S *DAUBERT* MOTION SEEKING EXCLUSION OF
### DEFENDANT'S IDENTIFIED EXPERT, ROBERT FUCETOLA.

THIS MATTER comes before the Court upon Plaintiff's *Daubert* Motion Seeking

Exclusion of Defendant's Identified Expert, Robert Fucetola, filed July 3, 2020 **(Docs. 194-**

**sealed & 228-redacted document).**  Having reviewed the parties' briefing and the applicable

law, the Court finds that Plaintiff's motion is not well-taken and, therefore, is denied.

### BACKGROUND

This is a products liability case arising from the apparent failure of an airbag to deploy

during a car accident while Plaintiff was working as an employee of the United States Forest

Service. Plaintiff alleges that on November 1, 2016, he was driving a forest service vehicle, a 2012

Dodge Ram 1500, when he hit two elk. The airbag did not deploy and he was injured. Plaintiff

claims that he has suffered serious personal injuries, has lost his job, has incurred permanent

disfigurement and will incur in the future, medical and medically related expenses.  The initial

complaint was filed on August 25, 2017 (Doc. 1) and Plaintiff filed a Third Amended Complaint

on November 21, 2018 (Doc. 43).

Plaintiff does not dispute that Dr. Fucetola is qualified by experience, training, and education to provide expert testimony on the issue of Plaintiff's neuropsychological claims.[1] Instead, he argues that the opinions and conclusions in Dr. Fucetola's written report are "unreliable and inadmissible." *See* Doc 194 at p. 1.  Following his review of all the records submitted, Dr. Fucetola concluded in part that:

> Plaintiff's neuropsychological test scores were all statistically "in the range that would be expected of a neurologically healthy man" the same age as Plaintiff and "did not support his subjective report of language, memory, and concentration difficulties following the November 2016 accident";

> Mild concussion does not cause people to cheat, deceive others, of fail performance validity tests;[2]

> There is no evidence of any new mental or emotional illness in Plaintiff following the November 2016 accident that did not exist previously, or any exacerbation of his prior mental condition; and

> Dr. Fucetola was not able to identify any valid evidence of cognitive impairment because of the accident.

Doc. 199-1 at 7; Doc. 194-1 at 29.

## DISCUSSION

Under the well-established standard set forth in *Daubert*, qualified expert testimony: (1) must be based on sufficient facts or data; (2) must be the product of reliable principles and methods; and (3) the expert must have applied the principles and methods reliably to the facts of the case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); Fed.R.Evid.

---

[1] Dr. Fucetola has a Ph.D. in Clinical Psychology and Neuropsychology from Washington University in St. Louis, and he is Board Certified in clinical neuropsychology by the American Board of Professional Psychology (ABPP). He is currently a Professor of Neurology and the Chief of Clinical Neuropsychology at Washington University School of Medicine in St. Louis. *See* Doc. 199-1.

[2] Dr. Fucetola's stated in his report that Plaintiff had reported, and later testified, that he had "cheated" on a neuropsychological evaluation administered by Dr. Joseph Sadek (a Veterans Administration psychologist) in order to "increase his scores" but Dr. Fucetola noted that this was not documented in Dr. Sadek's records nor was it plausible in the context of a standardized neuropsychological evaluation.  Doc. 194-1 at 29.

702; *see Hall v. Conoco Inc.*, 886 F.3d 1308, 1311 (10th Cir. 2018). *Daubert* provides a "flexible" framework for courts to use in their roles as gatekeepers of expert testimony. *Hoffman v. Ford Motor Co.*, 493 F.App'x 962, 974 (10th Cir. 2012) (internal citation omitted). Depending on the nature of the issues presented and the expert's particular expertise, certain factors may or may not be pertinent to an evaluation of reliability—but "the purpose of the *Daubert* inquiry is always 'to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 975 (citing *Dodge v. Cotter Corp*, 328 F.3d 1212, 1222–23 (10th Cir. 2003); quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Neither party requests a hearing, and a *Daubert* hearing is not required where the court makes sufficient findings on the record. *See United States v. Call,* 129 F.3d 1402 (10th Cir. 1997); *Robinson v. Missouri Pacific*, 16 F.3d 1083, 1089 (10th Cir.1994) (*Daubert* analysis requires a district court to "carefully and meticulously" review the proffered scientific evidence); *United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir.1999) (a district court is granted great latitude in deciding whether to hold formal *Daubert* hearing).

## I.      Reliability

Plaintiff contends that Dr. Fucetola's testimony and opinion cannot meet *Daubert*'s reliability principles because they violate standards set forth by the American Psychological Association, specifically Part 9 of the "Ethical Principles of Psychologists and Code of Conduct" ("APA Code"). *See* Doc. 194 at 5 (setting forth §§9.01 (a)-(d)).[3]

---

[3] The APA sections cited by Plaintiff state as follows:

9.01 Bases for Assessments - (a) Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantiate their findings;

A.     Failure to Conduct In-Person Examination

Plaintiff's first argument focuses on Dr. Fucetola's failure to conduct an in-person examination of Plaintiff. Plaintiff points out that Defendants could have but did not, ask for an independent psychological evaluation as permitted by Fed.R.Civ.P 35. Plaintiff points to APA Code 9.01(b) which prohibits a psychologist from providing any opinion regarding an individual's psychological characteristics unless "they have conducted an examination of the individual adequate to support their statements or conclusions."

The Court's first reaction to this argument is that basing a *Daubert* reliability challenge almost entirely on provisions from a professional code of conduct is somewhat risky.  Professional guidelines do not determine whether expert opinion testimony is based on sufficient facts or data or whether it is the product of reliable principles and methods under Rule 702(b) and (c). In other words, compliance with the APA Code does not dictate whether Dr. Fucetola's opinion testimony is admissible for *Daubert* purposes.  However, even premising this argument on the APA Code, Plaintiff's argument fails because the APA Code envisions situations where "an individual examination is not warranted or necessary for the opinion" when a psychologist is conducting a record review or providing consultation—as Dr. Fucetola was doing in this case. APA Code, §9.01(c).

---

(b) Except as noted in 9.01(c), psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations;

(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations.

The medical records reviewed by Dr. Fucetola were subpoenaed by Defendant from the U.S. Department of Veterans Affairs (the "VA"). Doc. 199-2 (Medical Records Affidavit). Doc. 229-5.

Among the records the VA produced was a 10-page neuropsychological report issued by Dr. Joseph Sadek ("Dr. Sadek"), a neuropsychologist with the VA. Dr. Sadek's report discussed Plaintiff's raw test scores ("test data"), but the report did not discuss the testing materials. Doc. 199-1 (Fucetola Decl.). These medical records were produced as non-privileged without a Protective Order and provided by Defendant to Dr. Fucetola.

After reviewing those VA records, Dr. Fucetola identified the need to review Dr. Sadek's complete file, including all testing materials. For that reason, Defendant then issued a second subpoena to the VA specifically requesting Dr. Sadek's testing materials. *See* Doc. 81-1. The parties thereafter agreed to a stipulated protective order providing that the materials requested in the second subpoena would be produced only to Dr. Fucetola. *See* Doc. 115.

Thus, §9.01(b) of the APA Code does not control here since Dr. Fucetola was conducting a records review and as set forth in his 30-page expert report (Doc. 194-1), his opinions and conclusions were consistent with those of another neuropsychologist—Dr. Sadek. Doc. 199-1, ¶¶8-13. Plaintiff also finds fault with Dr. Fucetola's failure to explain what efforts he made to conduct a personal assessment. *See* APA Code, §9.01(c) ("When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, **psychologists explain this** and the sources of information on which they based their conclusions and recommendations.") (emphasis added). However, Dr. Fucetola *does* provide an explanation in his Declaration, noting that Dr. Sadek concluded that there were no lasting cognitive effects from Plaintiff's head trauma in 2016:

> As stated in my report, Dr. Sadek concluded that "there were no lasting cognitive effects from [Plaintiff's] head trauma in 2016." In my report, utilizing the standard and accepted methodology, I performed a complete review of all records, including a thorough review and analysis of Dr. Sadek's objective neuropsychological testing.  After confirming the reliability and validity of his testing, I reached the same conclusion as Dr. Sadek. Dr. Sadek's in-person assessment of Mr. Munoz obviated the need for another in-person assessment by me or anyone else . . .

Doc. 199-1, ¶12.  The APA Code does not appear to be specific as to how, when or where a psychologist should explain why an individual examination is not warranted or necessary, and most certainly, a *Daubert* inquiry does not depend on this issue. Plaintiff's *Daubert* reliability challenge therefore fails on issues related to purported deficiencies under the APA Code.

### B.    Lack of Independent Conclusion

Plaintiff next challenges the reliability of Dr. Fucetola's expert opinion by claiming that the report does not contain any independent conclusions. He contends that it is "mainly a recitation of medical information which does not relate to any psychological evaluations" and "simply parrots other diagnoses reviewed from other medical providers." Doc. 194 at 6-7.  The Court does not share this view.   Dr. Fucetola's report undertakes a detailed review of various records, including: medical records (inpatient and outpatient); state and federal workers' compensation records for work-related injuries; neuropsychological testing by Dr. Sadek at the VA in November 2017; and legal records from this case as well as from other lawsuits filed by Plaintiff—all of which provide information about Plaintiff from several years prior to the 2016 accident through 2019.

Plaintiff describes Dr. Fucetola's expert opinion as a "summary of hearsay information." Doc. 194 at 6.  However, under the federal rules of evidence, an expert witness can express an opinion that is based in part or solely upon hearsay sources.  *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971) (rationale for exception to the rule against hearsay "is that the expert,

because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion . . ."); *In re James Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert can testify to an opinion formed from information handed to him rather than developed by him."). Dr. Fucetola was therefore permitted to base his opinion on other sources, including Dr. Sadek's neuropsychological testing, as long as his testimony is scientifically sound, that is, the product of reliable principles and methods. *See Tilstra v. BouMatic LLC*, 791 F.3d 749 (7th Cir. 2015) (an expert witness can rely on hearsay, provided that such reliance is accepted practice in his profession); Fed.R.Evid.R.703; *Arkwright Mutual Inc. So. v. Gwinner Oil, Inc*., 125 F.3d 1176 (8th Cir. 1997) (expert testimony based on inadmissible hearsay was properly admitted, where hearsay report was a type of data reasonably relied upon by an expert in the field).

In forming his conclusions, Dr. Fucetola did not simply accept Dr. Sadek's testing results—he independently corroborated them. He confirmed that Dr. Sadek had administered and scored the objective cognitive testing described in his report. Doc. 199-1, ¶¶9-12. The objective cognitive testing performed by Dr. Sadek involved scientifically-proven, standardized tests with known error rates. Dr. Fucetola verified the reliability and validity of that testing and then further assessed the results of that testing using the information in the available records. When Dr. Fucetola identified the need to review Dr. Sadek's complete file (including all testing materials and not just raw test data), Defendant issued a second subpoena to the VA specifically to obtain that material. Plaintiff may disagree with Dr. Fucetola's opinions and conclusions, but the Court finds that they were reached as part of Dr. Fucetola's thorough scientific analysis using appropriate scientific methodologies standard to neuropsychologists which renders his  expert opinion reliable and admissible under *Daubert*. Plaintiff's disagreement essentially goes to weight, an issue that can

be addressed by a vigorous cross-examination. *See Ferrera & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1 (1st Cir. 2001) (Rule 703 does not limit ability of opponent to cross-examine expert on details of inadmissible data).

C.   Plaintiff's Citation to Case Law Regarding Dr. Fucetola's Opinion Testimony

 Plaintiff states that Dr. Fucetola "falsely claims that he has never been subject to a court order limiting or striking my opinions." Doc. 202 at 3.  Plaintiff then goes on to cite a Missouri state court of appeals case and a Seventh Circuit case, both of which Plaintiff claims "struck" Dr. Fucetola's expert opinion testimony.  First, Plaintiff states that in *State of Missouri v. Gray*, (E.D. Missouri, Ct. App. No. ED104743-01), the court issued an opinion, filed on October 22, 2019, "upholding the trial court's decision to strike Dr. Fucetola's opinion regarding the defendant's general intelligence." Doc. 202 at 3. Plaintiff then claims that Dr. Fucetola's testimony "was also stricken" in *Stern v. St. Anthony's Healthcare Center*, 788 F.3d 276, 288 (7th Cir. 2015).

Dr. Fucetola's opinion testimony was not stricken in either case, and *Daubert* motions were not filed in either case.  In *Gray,* the trial court merely sustained an objection to a question on direct examination based on relevance and as a result, the substance of Dr. Fucetola's opinion on that issue was never disclosed.  In the *Stern* case, the Seventh Circuit noted that Dr. Fucetola's "speculative, untested suggestions were not adequate to satisfy" plaintiff's burden of creating a genuine issue of fact on summary judgment.

The rulings in both *Gray* and *Stern* are not relevant to the *Daubert* inquiry this Court is undertaking here and Plaintiff's remarks that Dr. Fucetola's opinion testimony was "stricken" in both of those cases amount to what the Court considers to be misrepresentation. Further, the Court allowed Defendant to file a surreply in part to allow Defendant to respond to Plaintiff's charge that Dr. Fucetola had "falsely claimed" that he had never been subject to a court order limiting or

striking his opinions.  In fact, Dr. Fucetola's claim was accurate: in both *Gray* and *Stern*, the

Court's rulings regarding Dr. Fucetola's testimony related to its weight and had no bearing on its

reliability for *Daubert* purposes.  Thus, the only "false claims" are those made by Plaintiff—in

accusing Dr. Fucetola of misrepresentation and Plaintiff's own misrepresentations regarding the

actual rulings in both cases.

## II.      Use of Raw Test Data

Plaintiff contends that Dr. Fucetola's use of "test data," which includes numerical raw and

scaled scores, *see* Doc. 1991, ¶9, violates both the APA Code and the Stipulated Protective Order

that was entered in this case. *See* Doc. 115.  This contention is baseless.

### A.      Use of "Test Data" Does not Violate the APA Code

Defendant does not deny that Dr. Fucetola included "test data" in his report but contends

that its use does not violate the relevant provisions of the APA Code:

> APA Code §9.04 (a):
>        The term *test data* refers to raw and scaled scores, client/patient responses
> to test questions or stimuli, and psychologists' notes and recordings concerning
> client/patient statements and behavior during an examination. Those portions of test
> materials that include client/patient responses are included in the definition of *test
> data*.
>
> APA Code §9.11:
>        The term *test materials* refers to manuals, instruments, protocols, and test
> questions or stimuli and does not include *test data* as defined in [§9.04]
> Psychologists make reasonable efforts to maintain the integrity and security of test
> materials and other assessment techniques consistent with law and contractual
> obligations, and in a manner that permits adherence to this Ethics Code.

Defendant asserts, and the Court agrees, that Plaintiff confuses "test data" with "test

*materials*"—which are distinguishable in the APA Code.  The Code does not prohibit the use of

test *data* and in fact, neuropsychologists are actually instructed to release test data in order to

facilitate the review of their findings by other qualified individuals.  *See* Doc. 199-1at 25 ("Test

Security: An Update" by Nat'l Academy of Neuropsychology, ("NAN," 10/13/2003)).[4] Dr. Fucetola's use of "test data" is consistent with the APA Code guidelines. He reviewed Dr. Sadek's 10-page evaluation report, including the test data listed on a table in that report and recited Dr. Sadek's test data on page 23 of his own report, Doc. 194-1 at 23. Disclosure of test data is "standard practice followed by neuropsychologists", including Dr. Sadek who also did so. *Id.*; *see also* Doc. 199-1 at 6 (Fucetola Decl.). On the other hand, Dr. Fucetola specifically noted in his Declaration that the "test materials" which were produced subject to the Protective Order were reviewed only by him. He did not share the "test materials" with counsel for Defendant nor did he disclose them to any other person. *Doc.* 199-1, ¶10.

B.     Use of "Test Data" Does Not Violate Court's Protective Order

Plaintiff describes it as "shocking" that Dr. Fucetola elected to publish the raw data test scores that were obtained from another psychologist (Dr. Sadek) because it violates this Court's Stipulated Protective Order, which states in part:

> . . . [T]he parties hereby stipulate that the materials subpoenaed will be provided only to Defendant's retained expert, Rob Fucetola, Ph.D., and shall not be released, copied, reproduced or transmitted in any form to any other individual or entity without the express written consent of the parties and the Court.

Doc. 115. However, based on the procedural history of this case, it is clear that Dr. Fucetola has never released any confidential information subject to this Court's Protective Order, because that Protective Order was solely intended to protect confidential testing materials—not testing *data*.

As mentioned earlier in this discussion, two subpoenas were issued to the VA regarding Plaintiff's records, Doc. 220-4, following this chronology:

---

[4] The NAN Test Security Update explains the reasons for distinguishing between "test data" and "test materials" (test questions and answers); why the disclosure of test data is appropriate while disclosure of test materials could result in "great public harm." Doc. 199-1 at 4 and 27. Further details on the distinction between the two categories are unnecessary for purposes of the Court's *Daubert* inquiry here.

- First subpoena:
  - Requested records pursuant to a HIPAA authorization from Plaintiff, was served on the VA on January 10, 2019.  Plaintiff never filed a motion to quash this first subpoena nor did he ever assert an objection to that subpoena.

  - Issued about two months *before* the Court issued the parties' stipulate Protective Order.  *See* Doc. 199-2 (Med'l Ctr Records Aff.).  The 664 pages (and 1 CD of images) produced by the VA in response to this subpoena included Dr. Sadek's *non-confidential* report which contained "testing *data*" but not "testing *materials.*"

- Second subpoena:
  - After reviewing Dr. Sadek's non-confidential report, Dr. Fucetola concluded he also needed Dr. Sadek's *confidential* testing materials in order to complete his analysis.  Doc. 199-1, ¶9. For this reason, Defendant issued a second subpoena to the VA narrowly requesting information related to Plaintiff's "neuropsychological testing" conducted on November 27, 2017 and  Dr. Sadek's testing materials. Doc. 81-1 (Sec. Subpoena to VA); Doc. 199-1, ¶¶9-10.

  - Plaintiff filed a motion to quash this second subpoena on May 23, 2020, stating that:

      > Defendant's counsel is entitled to receive Dr. Sadek's records and conclusions but should not be allowed to require Dr. Sadek to release the **raw test data** to any one other than a licensed mental health professional under an appropriate confidentiality order.

Doc. 107 at 4 (emphasis added). Shortly thereafter, the parties agreed to the Stipulated Protective Order, *see* Doc. 115.  Plaintiff's  motion to quash does refer to "test data," but the reference does not change the fact that the purpose for the Protective Order is to prevent disclosure of the test *material* obtained from the second subpoena for the following two reasons.

First, the Stipulated Protective Order expressly covers only "the materials subpoenaed. . . ." Dr. Fucetola had already obtained Dr. Sadek's "test data" when it was produced from the first subpoena and so the only "materials subpoenaed" in the second subpoena were Dr. Sadek's "test materials."  This is confirmed in Dr. Fucetola's Declaration as well.  Doc. 199-1, ¶10 ("The <u>test materials</u> generated by Dr. Sadek, which were produced subject to the Protective Order, were reviewed only by me.") (emphasis in original).

Second, Plaintiff's reference to the phrase "test data" in the motion to quash displays the same confusion between "test data" and "test materials" shown by Plaintiff in the instant motion; that is, Plaintiff appears to operate under the misconception that the two categories are interchangeable—and they are not. For example, Plaintiff's motion to quash states that "[c]ontrolling legal authority indicates that a psychologist is not required to release raw data and psychological test materials to non-psychologists." Doc. 107 at 2 (emphasis added). This statement is inaccurate, based on either the APA Code or "controlling legal authority." True, a psychologist is not *required* to release raw data to a non-psychologist but he or she is not *prohibited* from doing so, whereas the release of "test materials" is very much protected by the APA Code. Plaintiff's motion to quash also states, inaccurately, that "Dr. Sadek is prohibited, both by the Code of Ethics governing his practice, and applicable case law, from producing the raw test data to anyone other than a licensed psychologist." *Id*. at 2. As previously noted, the concern with "test security" articulated in the APA Code actually relates to test *materials*, not test data. *See* APA Code §§9.04 & 9.11.

Plaintiff claims to be concerned that Dr. Fucetola's report was reviewed by "Defendant's attorneys, their paralegal and assistants. . . [and] various officials working for the Defendant, its insurers. . . ." Plaintiff requests that Mr. Fucetola be ordered to appear before the Court and "provide the Court with a complete list of all individuals who have had access to or have reviewed his report." Doc. 194 at 9. This request is denied. First, there is no evidence to suggest that Dr. Fucetola disclosed test materials to any other person, and no reason to suspect Dr. Fucetola's assurances in his Declaration that he did not disclose the test materials to any other person. Doc. 199-1, ¶9. The Court sees no need for a hearing for the sole purpose of questioning Dr. Fucetola's veracity in his Declaration regarding disclosure of test materials. Second, the Protective Order

specifically prohibits the materials produced from the second subpoena from being "released, copied, reproduced or transmitted in any form to any other individual or entity without the express written consent of the parties and the Court." Doc. 115 at 1. The fact that members of defense counsel's team working on this case may have viewed the report does not appear to violate either the spirit or letter of the Protective Order. This is by no means the first case where an expert report has been prepared containing confidential or sensitive material subject to a protective order. If Plaintiff's concerns about disclosure extended to all members of the defense team, Plaintiff should have fashioned a protective order making that clear. Moreover, Plaintiff filed this products liability case claiming personal injuries including cognitive impairment as a result of the failure of the air bag in question to deploy when Plaintiff's vehicle struck two elk. Since Plaintiff is seeking monetary damages from Defendant as a result of the accident, Plaintiff has put his physical and mental condition at issue and so Defendant is entitled to have its expert witness, Dr. Fucetola, assess Plaintiff's claimed injuries. Dr. Fucetola's report, however, does not exist in a vacuum. Since the purpose of Dr. Fucetola's report is to assist and support the Defendant's position, members of the defense team need to and should have access to it provided they comply with the terms of the Protective Order.

C.      Dr. Fucetola Did Not Violate the New Mexico Administrative Code

Plaintiff contends that Dr. Fucetola's violations which render his methodology unreliable and inadmissible extend also to violations of the New Mexico Administrative Code ("NMAC"), which adopted the APA Code.[5] These contentions can be summarily dismissed.

First, with respect to Dr. Fucetola's use of test data/test materials, the Court has already discussed this issue above in the context of the APA Code. *See* NMAC 16.22.2.16 (Test Security).

---

[5] 16.22.2.19(E) (" The psychologist shall cooperate in investigations, proceedings, and requirements of this code, the ethical principles of psychologists and code of conduct of the American psychologist association, . . . .").

Second, Plaintiff conjectures that Dr. Fucetola may have used outdated tests, pointing to NMAC 16.22.2.15(J) ("The psychologist shall not base assessments, decisions, or recommendations on outdated tests or test data. . . ."). This issue goes to weight, not admissibility, and Plaintiff's counsel may take this up on cross-examination of Dr. Fucetola at the appropriate time.

Third, Plaintiff claims that Dr. Fucetola violated NMAC 16.22.2.12, which requires that a psychologist shall disclose confidential information only "with the written informed consent of the patient or client." Plaintiff does not specify *what* "confidential" information he references. To the extent he means "test data" and "test materials," the Court has already discussed this issue. Otherwise, the Court notes that the VA records were obtained via Plaintiff's HIPAA authorization. Doc. 220 at 6, n.1.

## III.    Integrity of Dr. Fucetola's Expert Opinion

Finally, Plaintiff charges that Dr. Fucetola "falsely claim[ed] credit and reliability for an assessment which he should have, but never performed" by attempting to "sneak in" Dr. Sadek's professional opinion for his own. Doc. 202 at 7. For support, Plaintiff cites to an order from the Northern District of California which excluded expert testimony and held that:

> No professional should reasonably rely on such a rigged and biased source of information for any materially important fact to his or her opinion, at least certainly not in the circumstances of the present case. There is no "particular field" in which experts go along with this charade other than in litigation. The field of testifying for a living is not what Rule 703 had in mind.

*Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 WL 2323856, at *2 (N.D. Cal. May 22, 2008).

The case cited by Plaintiff, *Therasense*, is a patent case involving a blood glucose monitoring product. Abbott Laboratories ("Abbott") proffered the opinion of an expert to support its claim that the accused products did not have a "whole blood filtering member," as required by

- 14 -

one of the claims in the patent. The expert's opinion was based on experiments that were conducted by Abbot employees, but the expert did not participate in, observe, or supervise any of the experiments, nor did Abbott permit defendants to question those employees, thus concealing all of the tests from discovery during all phases of discovery under a claim of privilege.

The court in *Therasense* soundly criticized an expert's reliance "on some factoid told to the expert by the client or someone else outside the courtroom . . . ." 2008 WL 2323856, at *1. The court took particular offense to the "secrecy" involved in "concealing all adverse or confidential test results and facts from the testifying expert" in order to ensure that the expert present only favorable testimony. 2008 WL 2323856, at *1 ("The plan is for the hearsay to sail into evidence when the truth might be materially different . . . ."). The instant case could not be more factually different. Contrary to the "spoon-feeding" of client-prepared and lawyer-orchestrated "facts" to a hired expert (as the *Therasense* court described the situation in that case, 2008 WL 2323856 at *3), Dr. Fucetola's conclusions are based upon his independent review of numerous records, including many records that were not available to Dr. Sadek. Doc. 199-1, ¶¶ 8, 12-14. Moreover, Dr. Fucetola requested that Dr. Sadek's testing materials be produced directly to him, under the Protective Order, so that Dr. Fucetola could confirm that Dr. Sadek's analysis and conclusions were reliable.[6] Simply stated, there is no indication whatsoever that Dr. Fucetola's report is "rigged" or "biased."[7]

---

[6] The Court notes that Dr. Sadek's evaluation of Plaintiff was conducted upon the referral of Plaintiff's primary care physician on behalf of the Federal Worker's Compensation for evaluation of Plaintiff's cognitive functioning and inability to return to work following the accident. Doc. 194-1 (Dr. Fucetola's expert rep't) at 21.

[7] In the words of the *Therasense* court:

> . . . [N]o professional should reasonably rely on such a rigged and biased source of information for any materially important fact to his or her opinion, at least certainly not in the circumstances of the present case.

2008 WL 2323856, at *2. These circumstances are not present in the instant case.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's *Daubert* Motion Seeking Exclusion of Defendant's Identified Expert, Robert Fucetola **(Docs. 194-sealed & 228-redacted document)** is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE